Good morning again. May it please the Court, my name is Molly Quinn. I represent the appellant Tevin Thin Elk. We're asking the Court to reverse the order denying Mr. Thin Elk's motion to suppress. Mr. Thin Elk was charged with being an unlawful user of a controlled substance in possession of a firearm based on evidence found after a traffic stop and dog sniff of a vehicle while he was in it. I'd like to start with the standing issue. The District Court did not address the validity of the reliability of the dog sniff because it found that Mr. Thin Elk lacked standing. But taking a step back, the dog sniff in this case resulted in basically two types of searches. The first is a search of Mr. Thin Elk's person, and the second, of course, is the vehicle, and the gun is found in the vehicle. But it's the search of his person that resulted in evidence of drug use and also the clip. Specifically on the scene, the officer found what he called a dime bag of marijuana in Mr. Thin Elk's coin pocket, and then after he was taken to the jail, they found an ink pen with methamphetamine residue. Mr. Thin Elk had standing to challenge a dog sniff for several reasons. First, he was told to stay in the vehicle during the dog sniff, so when that dog allegedly alerted, Mr. Thin Elk was in that vehicle. And second, because of that, the dog sniff was the basis for his continued detention, and it was the basis for the search of his person immediately after and then continuing into the jail. And the District Court erred in finding that Mr. Thin Elk lacked standing. But he does lack standing for the sniff of the vehicle, just not the subsequent search as opposed to, you know, as opposed to, let me put it differently, the search of the vehicle, he lacks standing for the search of himself, he has standing in your view. I don't know that I can completely agree that he fundamentally lacks standing to challenge a search of the vehicle. He lacks independent, standalone standing to challenge a search of the vehicle based on a possessory interest, but it does arise out of his being in that vehicle during the dog sniff and his continued detention thereafter, and so it is all intertwined. And so we think that if the Court finds, either this Court or the District Court finds that the dog sniff was invalid, that that should cut off all of the evidence, but even if it doesn't reach, I'm sorry. How about his standing to challenge the alleged prolonging of the traffic stop? How is that impacted? I think he definitely, he unquestionably has standing to do that. And I think that we also agree that the stop was unreasonably extended, particularly as it gets to his person because that is dependent on the dog sniff. But I do think that he has kind of a direct way to challenge the dog sniff and the resulting evidence, even if the traffic stop is not unlawfully extended up to the point of the dog sniff. So let me go ahead and dig into that in terms of the prolonging of the stop. You argue on page 2 of your brief that Officer Marty had the vehicle's occupant's IDs in hand but did not immediately relay that information to dispatch, but instead requested a canine and then went back to get the VIN. Conversely, the government argues on page 3 of their brief that Marty did not have the IDs until he went back to get the VIN number. Who is correct? I think that we are, and I don't have the transcripts right in front of me. I think he did acknowledge, and I can get that for rebuttal, that he had those ID cards in hand at that time. He said he was going back to get paper, and that is when he sat in the vehicle for some period, 40 seconds to a minute, and requested the canine unit and then took the time to describe where he was so that that canine unit could find him. One more quick question on the standings. I suppose it's a little different, and I'm just trying to get at this because it's really slippery. The dog sniff alerts to the trunk. They have identified the trunk. This is a hypothetical. Oh, okay. Yeah, sorry. Alerts to the trunk, and he says, well, it turns out that it's maybe something he has, but it really has, it's not his car. He stored something in the trunk. Would he then have standing to challenge what they find in the trunk? In other words, I'm trying to figure out, it's slippery. I'm trying to figure out what in terms of what's found in the car versus what's found on his person he would have standing to challenge. And my understanding of Supreme Court case law is he does not have standing to challenge what's in the trunk, even if it's, even if it belongs to him. I think that's hypothetical. It is, and I know that the district court, excuse me, not the district court, the magistrate court said, you know, Mr. Fennelk didn't even try to put on evidence that it was his gun or that he possessed the bag it was found in or under. I'm afraid I don't have a clear answer to that question.  I'm sorry. And what ends up happening is they deny that it's mine, which is why you lack standing of what's in the trunk.  But anyways, I just think it's a really slippery problem as to standing. Maybe it's best to avoid it since it's not jurisdictional. Right. I do think that if, I don't know, I don't want to say something I don't know from the case law. I do want to kind of, actually I want to move to the dog sniff itself. And we do, again, would reiterate that that dog sniff is necessary to get to what is more than a pat-down search on Mr. Fennelk's person. And that does result in the evidence of drug use giving rise to the first part of this charge. The government failed to establish an alert sufficient to provide probable cause for further searches. This was unquestionably an alert only. This was not full indication, trained behavior. This dog allegedly alerted by an increased rate of sniffing or breathing and he did so after being instructed, check right here. And this all happened within a matter of seconds. The dog was out of the patrol car for less than 30 seconds. The sniff lasted, I guess, generously less than 10 seconds. There's different times in the record, seven seconds, six seconds. And in that time, the officer took the dog to the driver's side, walked partway down the side of the vehicle, conducted a spin out, I mean took him back and spun him around, brought him back, said check right here about that seam of the driver's door and said good boy within three seconds. The dog didn't slam as the language he used, didn't sit down, didn't sit and stare at the source of the order, didn't, it didn't spin around or show excitability based on the odor itself. The dog didn't resist being taken back to the car after it allegedly had found the odor of narcotics. And we think that that just isn't enough to establish probable cause to arrest and search Mr. Thin Elk, which would be what would be required, or to search that vehicle and ultimately find the firearm. Was it the handler who testified that a final indicator was not required? Do you have that in the record here, that a final indicator is not required? He did, and that is the case law, that this court does not require a final indication. I'm curious, the senior trainer testified at the suppression hearing that Iwan, the dog, did not alert during recertification when drugs were not present. Did he testify what Iwan's alert looked like? He did not. I think that that... So how could he tell whether, what he was testifying to? I believe his testimony was that he would just depend on the handler saying this dog has detected narcotics. And so we don't have, we don't have how much there was, we don't have how long it took, and we also don't have what the behavior was that led to the handler saying there are narcotics here. And I think that is one of the big shortcomings of the certification records that we do have in this case. But in terms of the search itself, and maybe I'm misremembering this, we get a lot of dog sniff cases. Was it the dog breathing heavy or something like that? That was how it alerted? Which you can tell when a dog is breathing. I have a dog and I can tell when she's breathing heavy. So why, you know, why isn't that enough of an indication? Some dogs point, some dogs lift a paw, some dogs sit down. This particular dog tends to breathe heavy. I think a couple of things. From the cases that I have seen, there's always been something more. There's been tail wagging, there's been sitting, there's been spinning, all of that. But I think that that gets at what the defense expert said of when this dog was instructed to sniff right here and that's what it was doing. It was sniffing, that the increased rate of breathing is the act of trying to smell. And she testified that doesn't, that just doesn't mean that this dog has detected narcotics. It just means that this dog is doing what it was asked to do, basically, which is smelling. What do we do with, I know you're into rebuttal, what do we do with the rhetoric, the very fine opinion that talks about dog reliability and the organization providing a certification? Right, I think that rhetoric wouldn't control here because my reading of that opinion, at least from what I can tell, is that that is just about the reliability piece, the adequacy of the certification. And we are also raising that this just wasn't an alert and that wasn't a credible reporting. And the alert behavior in that case was more significant. I think that that dog alerted in more than one place and also that behavior was not just changing breathing but also wagging a tail faster and that was not something that the officer here said would be alert behavior. So I think that, that answers your question, that is the difference. That even if the certification is adequate, all of the circumstances we still don't have a reliable alert to provide probable cause for the further searches. I would like to reserve this little bit of time. Sure, we'll make it a minute. Thank you, sir. For sure. Mr. Collender. Good morning again, Your Honors. May it please the Court, my friend and colleague, Ms. Quinn. I'm Kevin Collender with the U.S. Attorney's Office in South Dakota. We are here asking that this suppression order denying the suppression motion be affirmed. In my view, the issue here for the Court revolves around this standing question not as to the gun in the car but as to the search of Mr. Thin Elk's person. Not as to his statements. I believe, I mean, that's all been brief, but I think, and I think Ms. Quinn was isolating down onto that very question. And to me, that's the issue here. Does someone have standing to question the reliability of a dog search when they are in the car themselves when the dog is searched and then that search, that dog indication becomes the basis for? As I read your brief on page 10, the government is arguing that a passenger in an automobile stop for a traffic stop does not have standing to challenge a search of their person. Is there a case law to support that? I don't think there is. And so that's kind of where I was leading. I think that there is standing here to challenge the search of the person. And so it gets to this question then of what, you know, the reliability of the dog sniff because I think that has to be decided in the sense that that's what triggers the search. But what if the traffic stop was improperly prolonged? Should the motion to suppress be granted? Well, certainly there's case law that says if you prolong a traffic stop past its purpose to bring in a dog, that that's a constitutional violation. And why is the second case here where he went back to the car, requested a canine, described his position before he completed the mission of the traffic stop? I think if the court were to find that here an 8-minute difference in time between the start of the search and the dog sniff was a prolonged, unusually prolonged, that would be new ground. And that's I thought under Rodriguez it didn't matter how long it was. Well So if you stop the mission of the traffic stop to conduct other searches that were not part of the mission, wouldn't requesting a canine be something other than the mission of the traffic stop? In this case, Your Honor, I don't disagree with you about what Rodriguez says. In this case, the canine unit was requested just in the midst of the other routine stuff that was going on. He was he asks for the canine. He's going back to get license registration, vehicle information, doing all the routine stuff that Rodriguez allows officers to do. He's doing it quickly. In fact, he checks the warrant status on his own computer because he feels like the dispatch is taking too long at one point. I say that because there's kind of an oddity here in claiming that this was a prolonged stop, but yet claiming that it was all too quick. But he finds the warrant after the sniff, right? He finds the warrant after the sniff has been completed. Right. And, well, he, I think, as the sniff is happening, he is confirming in his own vehicle for himself, he's making his warrant check, but he confirms it with dispatch after the sniff has been completed. And I think that's the body cam video here is, you know, you have two different officers there in their exhibits in the record. But you can see that he's credible. Both officers are credible by the timing because you see him passing each other as they're doing their work and talking to the different individuals. I don't think there was a prolonging at all because of the canine here. The initial purposes of the stop to confirm this, whether these people had warrants, confirm whether this car had been stolen, that was still ongoing when the canine arrived, when the canine sniff was complete. And so at the time he requested the canine unit, was he waiting for something? He was in, he just went back to his vehicle. To request the canine. To request the canine, but he was also... So how is that not a prolonging of the stop? I think he was also, I'm trying to remember exactly the moment he requests the canine. He's going back and forth to his vehicle to get a pen, to get a piece of paper, and that's because he's got to write the VIN number down and he grabs his radio at one point and, you know, initially and requests the canine, but... You seem to be arguing that Rodriguez has a time component for prolonging his stop and I'm not aware that there is one. Whether it takes him ten minutes to request the canine unit or one minute. Is there a legal distinction? I think what I'm saying here is that the purpose of the stop and all the Rodriguez things about collecting information and so forth was ongoing while the canine happened. And so... Ongoing in what sense? If he took a break? The canine was done sniffing when he got confirmation of the warrant status within minutes of the initial vehicle stop. So that's how close in time it was, that it was all happening at the same time. There was no prolonging here. In other words, if the canine unit had never been requested, there's really no reason to believe that this just initial stop and questioning wouldn't have taken the same amount of time. So wouldn't that line of reasoning mean that in any routine traffic stop an officer could request a canine unit? Well, you can't unreasonably prolong the stop. You have to have probable cause for the stop. But I think a canine unit can be requested when there's a stop. As part of the routine mission of a traffic stop? Well, I mean, I think you have to articulate some reason for that, and they did so in this case. There had been information about the passenger who had been identified initially, apparently about some drug dealings now, and this was a high crime area. So there was articulated reasons for that here. What's the earliest he had an articulated reason? Well, I think for the drug activity? No, to get the sniff. I think at the point... What's the sniff? Go ahead. ...that's driving erratically in this high crime area, and he realizes that the plates don't match the car. And that's the first, you know, interaction with dispatch. So you got a potentially stolen vehicle in a high crime area. I think that's sufficient to call a canine unit. What about the sniff itself? This is... I've seen a lot of dog sniffs, not personally, but on the record. And this is an awfully strange alert and a very thin thing. And I didn't even appreciate what opposing counsel said until she said it, which is that smelling is the process of breathing for the dog. So how do you separate? And I think you can, but it's hard to separate what the smelling versus the breathing is. Well, you do it just how the magistrate court did it here, which is you conduct two different hearings. You allow them to supplement briefing on this. You have, you know, hundreds of pages of transcripts of evidentiary hearings, largely focused on this question of the reliability of the alert. And you call in experts and they talk about it. And then the magistrate court has a report and recommendations that they issue, and that that's then reviewed for clear error. And I think that's the difficulty that Mr. Thin Elk has before this court, is, you know, in order to meet that standard of review for clear error, there must be extrinsic evidence contradicting the story, or it must be internally inconsistent or implausible on its face. And is this, was the alert thin here? Certainly. I mean, it doesn't, it's not the same as some other cases, but neither this court nor others have defined exactly what an alert must be. You take it in through testimony and you make a decision, and then this court reviews whether there's something extrinsic that contradicts the story. And there's not here. You have the handler who's been a handler of this dog for many years. You have the certification in place. You have everyone agreeing, the experts all agreeing, that an alert sometimes can be sufficient. And of course, this court's case law saying that there's, that an alert can be sufficient. So I think what the question gets at is questioning, well, did, was the magistrate court clearly erroneous in deciding that this was an alert? And I, using that standard of review, I don't think he can meet that burden. I mean, I just think of a case, you know, did the dog look right or left? You know, I mean, well, dogs look right or left all the time regardless. I'm just trying to figure out where the line is, where it's kind of like, come on, that's ridiculous. Well, and that's, I think, what the magistrate court was trying to discern here. And I think did so the proper way. Took in all this evidence and some of the evidence was also about the dog was pulling the leash. And then this handler assuring that he noticed this is an alert. I see I'm out of time, so I'll take my seat unless there's other questions. Thank you. Thank you for your argument. Ms. Quinn. Thank you, Judge Graza. I wanted to start with your question and get those record sites. If you look at page 43 of the first suppression hearing transcript, the magistrate judge asked some clarification questions of when the officer got the IDs. And he said right after I advised of the reason of the stop that he did that before he went back to get the paper. And I think that is backed up by exhibit two, his body cam footage, very early on at 7-18-32. So the government says the stop was not prolonged. Do you agree with that? No, we believe that it was unreasonably prolonged. And I do, with the limited time I have left, I do want to talk about, actually, the standard review here. I think if the district court conducted a de novo review of the magistrate judge's, I guess, credibility findings as to the dog, then it would be clear error for this court. But I don't interpret the district court's order as actually conducting a de novo review of the objections as to the dog sniff. And I think that it's a little bit unclear, as the district court said, I'm adopting the report and recommendation in full. But then explicitly said, because it found that Mr. Thinock lacked standing, it need not address, the district court need not address his remaining objections regarding probable cause of search, the dog's credibility, and the alleged cognitive bias. So I think that this was not a finding that was made by the district court that this court would then review for clear error, that there was no de novo review at the district court level. Just one quick follow-up question, if I may. Oh, go ahead. So I wanted to just follow up on that, on the earlier point that you were making, which is, what do you make of the fact that, I mean, it cuts both ways, I think, but that the warrant, they didn't, he did not, the officer did not actually confirm the warrant until after the dog sniff was over. To me, that most reasonably supports the government's case, that it wasn't unreasonably prolonged to the extent that he had the right to, you know, to look for the warrant. I think two things. I think it depends on what we're talking about with confirming the warrant. We disagree that his testimony was credible, that he independently saw the warrant at the time that he said he did, that for other reasons, we believe his testimony as to that, which we don't have documentation of on the video like the other things. And then, but I do agree that we don't hear dispatch confirm the warrant, if that's what you're asking about, until after the sniff, that's true. But I think that he was relying on his own search, and we would disagree with that credibility finding. Thank you very much. Seeing no more questions.